ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
JAN 3 1 2005
U.S. COURT OF FEDERAL CLAIMS

SWANSON GROUP, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 05- 179C

## COMPLAINT

## ALLEGATIONS COMMON TO ALL COUNTS

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 609.

2. Plaintiff is Swanson Group, Inc. ("Swanson").

3. Swanson was formally known as Superior Lumber Co. ("Superior"), having officially changed to its current name on March 7, 2002.

4. Defendant is the United States of America acting through the United States Forest Service, Department of Agriculture (the "Forest Service").

5. This action arises out of the Forest Service's deemed denial of Swanson's claim under the Contract Disputes Act, 41 U.S.C. § 601, et. seq. (the "CDA") for breach of the Forest Service's Prairie Thin timber sale contract no. 087483 (hereinafter also referenced as the "Contract").

6. The Contract was awarded by the Forest Service to Swanson under Swanson's previous name (Superior) on July 8, 1999. The Contract was for the sale and harvest of approximately 2,311 mbf (thousand board feet) of timber located in the Umpqua National Forest in Oregon. The original termination date of the Contract was August 31, 2001.

7. On July 12, 2004, Swanson submitted a properly certified claim letter to the contracting officer pursuant to the CDA, seeking damages and requesting a final decision within 60 days.

8. In a letter dated July 22, 2004 sent to Steven Swanson (Swanson's President), Brenda L. Woodard (the "contracting officer") acknowledged that the Forest Service had received Swanson's claim, and indicated that she would render a decision within 60 days, i.e., by September 11, 2004.

9. In a letter dated September 1, 2004 sent to Steven Swanson, the contracting officer notified Swanson that she would not issue a final decision by September 11, 2004, and instead would issue a final decision in an additional 60 days, i.e., by November 10, 2004.

10. In a letter dated November 3, 2004 sent to Steven Swanson, the contracting officer notified Swanson that she would not issue a final decision by November 10, 2004, and instead would issue a final decision by January 8, 2005.

11. In a letter dated January 3, 2005, the contracting officer notified Swanson that she would not issue a final decision by January 8, 2005 and would instead issue a final decision in yet another 60 days, which would be March 9, 2005.

12. The contracting officer has not made a good faith attempt to issue a final decision.

13. Because the contracting officer neither issued a final decision within 60 days, nor issued a final decision within the time in which she told Swanson on multiple occasions that she would issue a final decision, the contracting officer has failed to satisfy her obligations under Section 605(c)(2) of the CDA, and, as a result, under Section 605(c)(5) of the CDA, the contracting officer is deemed to have denied Swanson's claim, allowing Swanson to bring a suit on the claim in this Court.

14. Swanson intended to begin harvesting the Prairie Thin sale in the 2nd and 3rd quarters of 2000.

15. However, before Swanson could begin harvesting, on August 2, 1999, the U.S. District Court for the Western District of Washington, Judge Dwyer, issued an opinion on the parties' cross-motions for summary judgment in an action styled Oregon Natural Resources Council Action v. U.S. Forest Service and Bureau of Land Management, 59 F. Supp. 1085, No. C98-942WD ("ONRC Action"), in which the court found that the Forest Service, when approving certain timber sales, arbitrarily and capriciously violated the plant and wildlife survey requirements in the President's Northwest Forest Plan. Based on this finding, the court granted summary judgment against the Forest Service and entered an injunction that immediately suspended certain timber sale contracts identified in the amended complaint.

16. On August 26, 1999, the court expanded its previously entered injunction to another 25 timber sale contracts, including the Prairie Thin timber sale contract.

17. On August 31, 1999, the Forest Service advised Swanson that the Forest Service would not approve any plan of operations for the Prairie Thin sale while the injunction remained in force, which effectively prevented Swanson from starting its harvesting operations as Swanson expected.

18. Although Swanson had already invested significant amounts of time and money in anticipation of being able to begin harvesting in the 2nd quarter of 2000, Swanson reluctantly complied with the Forest Service's suspension, and did not begin harvesting the Prairie Thin sale.

19. In late 1999, the environmental activist plaintiffs, the Forest Service and BLM filed a stipulation and proposed order for dismissal in ONRC Action, under which the Forest Service agreed, among other things, to continue the suspension of operations on the Prairie Thin timber sale until certain wildlife survey requirements (which the Forest Service had failed to fulfill prior to awarding the Prairie Thin timber sale contract) were satisfied. The Forest Service also gave the environmental activist plaintiffs the right to review any completed surveys and to object to their sufficiency before operations on the sale could resume.

20. As a result of the above-mentioned agreement between the environmental plaintiffs and the Forest Service, the ONRC Action lawsuit was dismissed. Pursuant to the agreement the Forest Service continued to refuse to permit any operations on the Prairie Thin sale until all of the surveys required for that sale had been completed. The surveys were not completed until on or about June 9, 2003.

21. The Contract remained fully suspended for nearly four years, from August 31, 1999, until June 9, 2003, when the Forest Service finally notified Swanson that the suspension was lifted.

22. When Swanson bought the Prairie Thin timber sale, it was relying on the timber from that sale to supply its mill for at least parts of 2000 and 2001.

23. Because of the Forest Service's suspension of operations, Swanson was unable to remove any timber from the Prairie Thin timber sale, and Swanson was forced to purchase replacement timber at a substantially higher cost in order to supply its mill.

24. The net replacement cost Swanson incurred for the anticipated 2,311 MBF from Prairie Thin was $270,459.65.

25. At the time of the suspension, Swanson had deposits on the sale totaling $69,200. On February 24, 2000, this amount was reduced to $1,384. The deposit was restored to $69,200 on June 9, 2003. Interest on these sums through June 9, 2003, when the suspension was lifted, totals $2,288.67. Swanson is entitled to recover these interest costs.

26. At the time of the suspension, Swanson had a performance bond on the sale in the amount of $70,000. On February 22, 2000, this amount was reduced to $3,500. The cost of maintaining this bond through June 9, 2003 totals $837.39. Swanson is entitled to recover these costs.

27. Swanson incurred $2,304.50 in having its personnel assist in the preparation of its CDA claim. Swanson is entitled to recover these costs.

28. Swanson's total damages incurred as a result of the Forest Service's wrongful suspension of the Contract are $275,890.21, plus CDA interest.

**COUNT I**

29. Swanson incorporates and realleges paragraphs 1-28 above.

30. Because the Forest Service did not bargain for the contractual right to absolve itself from liability arising out of court orders caused by its own improper and unlawful actions directly related to the approval and award of the Contract, the Forest Service's suspension constituted a material breach of the express terms of the Contract.

**COUNT II**

31. Swanson incorporates and realleges paragraphs 1-28 above.

32. In the alternative, the Forest Service's suspension of Swanson's performance under the Contract constituted a material breach of the Forest Service's implied duties under the Contract to cooperate and not to hinder Swanson's performance.

**COUNT III**

33. Swanson incorporates and realleges paragraphs 1-28 above.

34. In the alternative, the Forest Service breached the Contract because in suspending Swanson's performance the Forest Service unreasonably, capriciously and arbitrarily exercised its express powers under the Contract.

**COUNT IV**

35. Swanson incorporates and realleges paragraphs 1-28 above.

36. In the alternative, in clause CT6.25 (1/93) of the Contract the Forest Service warranted that based on all information reasonably available prior to the award of the Contract, the Forest Service had already taken and specified in the Contract all adequate measures to protect the habitat for sensitive, threatened and endangered species when it designed the Contract and awarded the Contract to Swanson.

37. At a minimum, prior to the award of the Contract, the Forest Service did not know whether all adequate measures to protect the habitat of sensitive, threatened or endangered species had been taken or had been specified in the Contract.

38. The Forest Service's failure to perform the required plant and wildlife surveys and subsequent suspension of the Contract in order to do so after award to determine whether additional measures were necessary to protect plant and wildlife habitat constituted a material breach of the Forest Service's express warranty in clause CT6.25.

**COUNT V**

39. Swanson incorporates and realleges paragraphs 1-28 above.

40. In the alternative, even assuming that the Forest Service had some authority to suspend Swanson's operations under clause CT6.01, the Forest Service retained an obligation to implement any such suspension reasonably.

41. The Forest Service's suspension of Swanson's operations under the Prairie Thin timber sale contract lasted nearly four years (from August 1999 into June 2003). The length of this suspension was unreasonable in duration and the Forest Service failed to undertake reasonable efforts to complete the required surveys in a timely manner in order to permit Swanson to operate.

42. Accordingly, the unreasonable duration of the Forest Service's suspension of the Prairie Thin timber sale contract constitutes a further material breach of that contract.

**COUNT VI**

43. Swanson incorporates and realleges paragraphs 1-28 above.

44. In the alternative, assuming that the Forest Service's suspension of the Contract was not a breach, the Forest Service breached the Contract by wrongfully failing and refusing to pay Swanson certain out-of-pocket costs within the scope of contract clause CT6.01, including interest on deposits, the cost of maintaining bonds during the suspension and Swanson's cost of preparing its CDA claim.

45. As a direct result of the Forest Service's breach of clause CT6.01 Swanson incurred such costs in the amount of $5,430.56. Swanson is entitled to be reimbursed for these costs.

WHEREFORE, plaintiff respectfully requests that this Court:

(a) rule that the Forest Service breached the Prairie Thin timber sale contract;

(b) overturn the Contracting Officer's denial of plaintiff's claim;

(c) award plaintiff all the damages it has suffered as a result of the Forest Service's wrongful suspension and breach of the Prairie Thin timber sale ($275,890.21) as alleged alternatively under Counts I-V, plus applicable interest in accordance with the Contract Disputes Act;

(d) award plaintiff all compensation due plaintiff under clause CT6.01 as alleged in Count VI of the complaint;

(e) award plaintiff its costs and attorneys' fees incurred in pursuing this action; and

(f) grant plaintiff such further relief as this Court deems just and proper.

Respectfully submitted,

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Alan I. Saltman
Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: January 31, 2005